# CHARLESTON.

A. J. PECK, ASSIGNEE OF ELK MOTOR TRUCK CO. v. W. S.
ROBERTS et al.

Submitted March 8, 1921.    Decided March 15, 1921.

1.  APPEAL AND ERROR—*Supreme Court Will Examine Depositions
    and Records, Where Conflicting, to Determine Which of the
    Lower Courts it Will Sustain.*

    Where there has been a finding of fact in a chancery cause
    by the Court of Common Pleas of Kanawha County from de-
    positions of witnesses which are conflicting and irreconcilable
    which finding has been overruled and disaffirmed by the Cir-
    cuit Court on appeal, this court will determine for itself from
    the depositions and record which of the lower tribunals, if
    either, it will sustain. (p. 207).

2.  EVIDENCE—*Circumstances Surrounding Two Persons Who Dis-
    agree in Their Testimony as to Transactions Between Them
    Considered.*

    Where the evidence of two persons totally disagrees as to
    the intent and purpose of a transaction between them, the
    facts and circumstances surrounding them and their acts,
    then and afterwards, with relation to the transaction, will be
    viewed and considered in order to ascertain which, if either,
    should be sustained. (p. 207).

    (RITZ, PRESIDENT, absent.)


Appeal from Circuit Court, Kanawha County.

Suit by A. J. Peck, Assignee of the Elk Motor Truck Com-
pany, against W. S. Roberts and others.    Decree for com-
plainant, and defendant named appeals.

*Affirmed.*

*Davis & Davis,* and *Connor Hall,* for appellant.
*Henry S. Cato,* for appellee.

LIVELY, JUDGE:

This appeal brings up for review a decree of the Circuit
Court of Kanawha County entered on the 20th day of Sept-
ember, 1919, which reversed a decree of the Court of Com-
mon Pleas entered on the first day of July, 1919, dismissing

the plaintiff's bill.    The decree of the circuit court, under review, entered a judgment for the plaintiff for the sum of $1,032.00 with interest from the 9th day of March, 1913, and directed sale of the interest of defendant Roberts in certain real estate for payment thereof.    In the year 1911 W. S. Roberts, defendant, formed a corporation, known as the Kanawha Auto Truck Co., for the purpose of manufacturing and selling a truck of his special design, and interested R. G. Quarrier, J. L. Sydenstricker, Geo. Gates and others.    The capital stock was $50,000.00 and the par value of each share was $1.00.    For his design of the truck, services and time expended in forming the corporation he was voted bonus stock amounting to $5,000.00.    He was elected president of the company and was the acting manager and moving spirit. The business of the corporation was unsuccessful and at a later date the corporate name was changed to the Elk Auto Truck Co., and the shares of stock thereafter issued were at $100.00 per share par value.    About the time of the reorganization S. A. Moore was selected as the president of the corporation and Roberts was selected as vice-president. On the 22nd day of September, 1913, the reorganized corporation made an assignment to the plaintiff, A. J. Peck, trustee, of all its property and assets for the benefit of its creditors.    It does not appear at what date Roberts severed his connection with the corporation but it does appear that he left this state on the night of the 14th of July, 1913. The plaintiff, Peck, trustee, discovered on the records of the company that Roberts had used the sum of $1,032.00 of the funds of the company  on the 8th day of March, 1913, when the company was in failing circumstances, for the payment of a note given by him and endorsed   by R. G. Quarrier for $1,000.00, which had been negotiated at the Kanawha Valley Bank; and conceiving that this constituted a diversion  of the funds of the company for the payment of an individual debt, instituted this suit against W. S. Roberts and R. G. Quarrier and attached the interest of defendant Roberts in certain real estate situate in Kanawha County. Roberts answered the bill and depositions were taken.    In the meantime the suit had been transferred to the docket of the Court of

Common Pleas, and that court found for the defendant Roberts and dismissed the bill; and, as above stated upon appeal, the Circuit Court of Kanawha County reversed the Court of Common Pleas and directed a sale of the property attached in satisfaction of the debt. Roberts' defense is based on the theory that this note which he negotiated to the Kanawha Valley Bank on the 30th day of April, 1912, and which was signed by him and endorsed by Quarrier, was made and used for the purpose of raising funds for the corporation and was not his individual debt. On the other hand the plaintiff asserts that this note was the individual obligation of Roberts and that he had no right to use the funds of the corporation for its payment.

It appears that Quarrier had made a written subscription for stock in the corporation, amounting to $2,000.00, on which he had paid at various times an aggregate of $1,000.00. On April 30th, 1912, defendant Roberts approached him for the purpose of getting more money, as he then claimed, for the unpaid balance of stock. Quarrier took the position that the understanding between himself and Roberts was that he should pay only $1,000.00 on his subscription and the other $1,000.00 was to be given to him by Roberts out of the $5,000,-00 bonus stock which had been voted to Roberts for his plans, services, etc. Roberts then seemed to agree with Quarrier but stated that the stock was good and he would like to have it; thereupon, according to the testimony of Quarrier, the latter proposed that he would assist Roberts in getting the money to pay for the stock, if he so desired, and the note was then executed by Roberts, which Quarrier endorsed. Roberts' theory, as outlined in his evidence, is to the effect that this note was for the purpose of raising money for pressing financial needs of the company and that the stock of $1,000.00, then under discussion, would afterwards be sold and the proceeds used to pay off this note. He testified, using his own words: "It was my understanding that if we could get this banking accommodation with the note and sell some additional stock that we would relieve Mr. Quarrier, if we could, of his subscription for the other thousand."

The result of this case depends largely upon the testimony
of these two witnesses and their testimony is totally diver-
gent.    It is therefore necessary to closely scan and con-
sider the acts of the parties at that time and afterwards, to-
gether with the records of the company and the facts and
circumstances surrounding the parties.     Roberts was the
president of the company and was acting as general manager
and the books were kept in the office of the Triple State Elec-
tric Co. of which Roberts was general manager.    It appears
from the evidence of Sydenstricker, the bookkeeper, that an
entry was made on the subscription account of Quarrier as of
the 30th day of April (the date on which this note was given)
which closed the subscription account of Quarrier, and on
March 18, 1913, the date on which the note was paid out of
the company funds, there is an entry, which Sydenstricker
testifies to be in Roberts' handwriting, "Unsubscribed stock,
K. V. Bk. R. G. Quarrier 51, $1000.00 dis. & int. $32.00." On
August 1, 1912, a general statement of the assets and lia-
bilities of the company was made up and sent to the stock-
holders, which showed that the unpaid stock subscriptions
amounted to the sum of $761.00.    No account seems to be
taken in this statement of the $1,000.00 note, either as an as-
set or as a liability. So far as the corporation was concerned,
at that time it had no knowledge of this outstanding note.
At least it was not treated as an obligation.    In that state-
ment the accounts receivable in the assets amounted to
$680.09 and the bills payable in the "liabilities" amounted
to $500.00, only.    When the corporation was reorganized
and its name changed to the Elk Auto Truck Co. and the par
value of the stock  changed to $100.00 per share, a certifi-
cate for 10 shares of stock of the par value of $1,000.00 was
issued to Quarrier and the testimony is that these new certi-
ficates were to take the place of the outstanding stock in the
old company.    At that time Roberts was vice-president of
the company and still in active charge.    It is reasonably
clear that Roberts acquiesced in the claim of Quarrier that it
was the understanding that he should take only $1,000.00 in
stock in the original company.    This is evidenced by what
was done on the 30th day of April, 1912, and by the subse-

quent acts of Roberts, and the acts of the corporation in issuing the new stock to Quarrier.     Another most significant fact appears and that is that after this note had been executed and negotiated, several thousand dollars worth of stock in the original company was sold and paid for.     Roberts testified that between seven and eight thousand dollars worth of stock was sold after that time and all paid for with the exception of about $1,000.00 worth.     If his theory was correct, that the note was given in order to raise money for pressing financial needs, and that this stock in question was to be sold and the note paid from the proceeds, it is not perceived why he did not take the money from the subsequent sale of stock and pay off this obligation for which he was individually liable.     Moreover, it is shown, reasonably clearly, that Roberts treated this note as his personal obligation, because in making the renewals thereof he paid the discounts out of his personal funds; and then when he made up the financial statement as of August 1, 1912, no notice whatever is taken of this outstanding note.     It was not treated as an obligation of the corporation.     Another circumstance which militates against the claim of Roberts, that this additional $1,000.00 of stock was afterwards to be sold and the proceeds used to pay this individual note, is that several days after the note had been executed he issued two certificates of stock, each for 1000 shares in the name of Quarrier and delivered the same to Quarrier.     Quarrier's statement in regard to this is positive, that the additional certificate of stock for $1,000.00, which was handed to him, was for the purpose of securing him as endorser for Roberts on this note and that he had supposed that Roberts would issue the stock in his, Roberts', name and assign the same to him as collateral security and did not notice that it was issued in his name at the time, or, if he did notice the irregularity in the issuance, he took the stock nevertheless with that understanding.     If Roberts' theory, that he intended to sell this controverted stock in order to pay the note, was correct, it would be most unusual to issue the stock in this way.     These circumstances, to our mind, bear out the theory of the plaintiff and the evidence of Quarrier.

88 W. Va.

On this conflicting evidence the court of common pleas decided for the defendant and the circuit court decided for the plaintiff, as above stated.    It is at once apparent that the question of preponderance of the evidence is difficult to determine.    This court has had much difficulty in arriving at a conclusion.    What rule should this court invoke for its aid when these two lower courts, each with concurrent jurisdiction and presided over by able, conscientious and learned jurists, have reached opposite conclusions from the very same facts?    It is insisted that the finding of the court of common pleas should have prevailed in the circuit court, and should prevail in this court, under the familiar rule that an appellate court will not disturb the findings of the trial court on questions of fact, unless clearly wrong, where the evidence is conflicting.    Every rule of law and procedure is based on some good reason.    The reason for this rule is that the trial court has the opportunity of observing the witnesses before it and their manner and demeanor in giving their testimony. This rule applies with special force to trials in the lower court by jury, or when a court at law tries in lieu of a jury; but the rule is not invoked strictly in chancery cases when the evidence is brought in by depositions.    In such cases the lower court does not have this opportunity for observing the witnesses.    However, it is usual for the appellate court to sustain the lower court in chancery cases on findings of fact where the evidence is conflicting or uncertain, on the theory that the lower court is sitting in the neighborhood where the controversy arises and is closer to the people and may have some peculiar advantage in that regard over the appellate court.    *Smith* v. *Yoke,* 27 W. Va. 639.    That reason does not apply as between the common pleas court and the circuit court.    Both courts sit in the same county at the same court house and this cause was heard upon the same depositions.    Both courts are equally near to the people, and neither has any special advantage over the other in that regard.    The common pleas court was designed to relieve the circuit court of the enormous  congestion of business therein and has equal jurisdiction and is made inferior only in order to conform with the Constitution.    It could not

have been created under the Constitution except as an inferior court to that of the circuit court.

We conclude that equal weight should be given to the findings of these two lower courts on questions of fact deduced from conflicting depositions in a chancery cause.    Neither should have preference over the other.    We think the true rule to be followed in this case is that invoked where a commissioner in chancery has made a finding of fact, returning with his report all the evidence on which the finding is based, and the lower court overrules and disaffirms his finding.    In such instances the appellate court must determine from the record for itself whether it will sustain the commissioner or the circuit court.    *Hyre* v. *Lambert,* 45 W. Va. 715; *Roots* v. *Kilbreth,* 32 W. Va. 585.    In some jurisdictions an appellate court will not review the findings of an intermediate court affirming, modifying or reversing the trial court on controverted questions of fact where there is any evidence to support the findings of the intermediate court, and where it correctly applies the law to the conclusions of fact.    4 C. J. Sec. 3071.    But as above intimated, we do not follow this rule used in other jurisdictions, but will give equal weight to the findings of the common pleas court and circuit court, and will examine the evidence and pass upon the questions of fact.

We affirm the decision of the circuit court.

*Affirmed.*